Case number 23-3596, Metron Nutraceuticals, LLC versus Christina Rahm Cook et al. Oral argument, 15 minutes for plaintiff, 15 minutes to be shared by defendants. Mr. Leister for the appellant. Good morning. My name is Dan Leister on behalf of the appellant, Metron Nutraceuticals, a small company in Cleveland, Ohio. I'd like to reserve three minutes for my rebuttal. On October 14th of 2015, three individuals got together with Metron's confidential, not publicly available information for the sole purpose of creating a patent application that they would then use to create a competing product that directly competed with Metron's patent and Metron's product. Those three individuals were Clayton Thomas, Christina Cook, and Mark Adams. Now, Metron Nutraceuticals had no knowledge of this meeting. They did not authorize the use of their confidential, not publicly available information. In fact, and to make matters worse, each one of these individuals at the time that this occurred had effective mutual confidentiality agreements with Metron Nutraceuticals in which each one of them promised that they would not disclose, use any confidential Metron information without Metron's direct knowledge and written consent. Can I ask you about Mr. Thomas? Yes. Why isn't statute of limitations a problem for you with his claim? Because you filed the complaint in 2016, correct? And that one related specifically, if you look at paragraph 75, you talk about the trade secret and you talk about the patent pending. And so he clearly knew the information before that. So just to correct you on the complaint that was filed, there was a complaint filed against Clayton Thomas at the time. There was a breach of his agreement with Metron, number of causes of action. We also knew that he had access to Metron documents in his capacity of his involvement with Metron. So we included a claim for trade secret misappropriation under OTSA. The paragraph that you're referring to in that complaint was that Clayton Thomas had reached out to a founder or a potential funder of Metron named Larry Hoffensperger. And he was attempting to, quote, knock off Metron's patent. Knock off, and it's a bit pedantic, but it's used as a verb in the complaint, meaning we knew that Clayton Thomas was out in the market. He was trying to come up with his own product to compete with us. Metron was upset by this. They thought that was a breach of his agreements with Metron. And Metron sued him, as they should. We had no knowledge. I'm sorry, go ahead. I'm sorry, but known or should have known, it says that you extended considerable time, expense, and effort to discover, develop, and assemble the trade secret information. The information is not generally available to Metron's competitors, and its patent is pending, right? Correct. So that's the initial patent application that you abandoned, or you modified, I guess. And that Thomas was well aware of the confidential and propriety information of Metron's trade secret information. Which he was. Okay, so what are you, if you're saying he misappropriated it, then why isn't that known or should have known, is I guess my question. So the claim that were before this court is premised on an application that copied 72 portions, almost verbatim, from Metron's non-public patent application. We could not have brought the case that we have before you without the ability to even see that patent, to discover the 72 examples of copying. The big portion of this case is premised on that 72 sections that were lifted, essentially, from Metron's application. That application is not mentioned in the previous complaint, and it couldn't have been. Because that application, the Cook-Entox application, that didn't become public until April of 2017. There's literally no way, unless somebody voluntarily came to us and said, oh, by the way, here's a copy of something we filed before the USPTO, which believe me, the defendants did not do and would have no intention of doing, there would be no way that Metron's claim against Thomas could have included this conspiracy that happened in October 14, 2015. Let's be as strict and conservative as possible, right? The earliest time that the four-year statute of limitation period could start is April of 2017. That's assuming Metron's IP attorney was refreshing that USPTO database every minute. And on April 2017, the minute that that became public, it pops up, he notices the similarities, and we file suit right away. Before that, anything that happens before we have that knowledge, there's no way we could have known that. And I think the district court made even further error by extending this potential bar against Clayton Thomas also to Christina Cook. And the reason the district court gave for that was we knew that Christina Cook was Clayton Thomas' girlfriend. So, I mean, it's a bit strained. So, our view is if any issue of illegal determination on the time bar should have been made, if any, should have been in Metron's favor. Because the triggering event in our view was that when could we have known about this infringing application that copied 72 portions? April 2017. That's literally the earliest we ever could have known about that. Can I ask you what's your best evidence Adams breached and or misappropriated? Like, what's the best evidence you have? The meeting in October 14th of 2015 was set up by Mark Adams. It happened at his offices. Are you talking about the meeting with the patent attorney and Cook? Yeah. October 14th of 2015 is when these three individuals got together to create this. Oh, you're talking about Adams, Thomas, and Cook. Was your question about Adams specifically? Yes. Yeah. So, it goes back to that meeting on October 14th, 2015. Okay. It was set up by Mark Adams. It was agreed to by Mark Adams. There's correspondence between the individuals saying we need to meet up. We need to do this quickly so we can win the race. The race was we need to get a market, we need to be first to market. We need to have an application directly competing with Metron. Adams at his deposition admitted the entire reason he got these individuals together at his offices was so he can find somebody other than Metron to bring a product to market. So, he was bound by a mutual confidentiality agreement. Go ahead. I mean, just because somebody has entered the field doesn't mean you have to get out of it. I mean, there are ways of trying to develop something to compete that don't involve infringing on things or using confidential information. I mean, wasn't the evidence that he was assured that they weren't going to be using confidential information? The testimony about what was said to whom during this October 14th meeting is all over the map. The defendants wildly disagree and point the fingers at each other. We think this alone created genuine issues of fact that almost prohibited the district court to interject themselves as a fact finder and try to sort all of this out. But the evidence and testimony was conflicting. Christina Cook felt that she was pressured into this by Mark Adams and Clayton Thomas. Mark Adams says, well, I was assured that all the information in this application was original to Christina Cook. Christina Cook testifies, I was up front and I told them that I was using information that I obtained from Metron. So, the lines crossed in terms of... Did you hold Adams or... At one or more individuals, Adams' attorney. So, Adams was the one that brought the IP attorney to that meeting. It's the same IP attorney that represented Adams' company, and talked solutions throughout the duration of the prosecution of the Cook and Cox patent. Did she say also that he may have been in the room when they were discussing the patent? She said he may have been in the room. She told one or more individuals. My view on, obviously we weren't there. We're piecing together this from afar based on... Your point is you can use Cook's testimony to beat summary judgment. Is that my understanding of what you're saying? Is like Cook herself says, he may have been in the room. He brought the patent attorney. He knew I was using these documents. Did she say that? Am I right about that? I think if you... Part of her testimony you can use. I think the circumstances alone also, but mix that with what Mark Adams testified to. Which he said, I made it abundantly clear, according to Mark Adams, I made it abundantly clear to Christina Cook even before they met that I don't want you to even bring any information from Metron to this meeting. So if what he's saying is true, it's clear in conjunction with what Christina Cook is saying about how I was open about what I was bringing. There's clearly issues of fact here where any jury could figure out and make a determination as to credibility, who's telling the truth, what's the most reasonable explanation as to who knew what and when. All of this in our view is this is not the type of case that is appropriate for a district court to bring down the hammer, dismiss all the claims against all defendants on what I see as a very contested factual record. And I think that that has to do with the time bar issue. And under Ohio law, trade secret is just like the existence of negligence. It's just like the existence of causation. Ninety-nine out of a hundred times, that's a jury question. Very rarely does a court jump in and say, I'm going to find as a matter of law that you were negligent, or I'm going to find as a matter of law that this accident caused this spinal injury. You rarely see that under Ohio law, the existence of a trade secret and trade secret misappropriation, it's treated the same way. So in my view, based on the conflicting information from the defendants, all the information in the record, and we haven't even talked about Metron's uncontested expert testimony from Dr. Alberti, where he said it's clear from the sheer extensive nature of the copying alone that they were using these trade secrets to comply with the USPTO requirements. Dr. Alberti testified, without those 72 sections, they didn't stand a chance before the USPTO. That thing would have been thrown out. There's no way they could have satisfied any of the requirements before the USPTO. So there was a clear benefit to the people that were doing it. There was a clear detriment to my client for having this out there. And we think the court abused its discretion and committed errors of law in what all the evidence should have been viewed in light most favorable to Metron. All of these disputes should have been looked at through the lens of how can we figure out how this supports Metron's claims. We don't think that was done. We think there's definitely genuine issues of fact here. And we ask that this court reverse the order that granted summary judgment against the plaintiff on all claims. Can I ask? Yeah, go ahead. Or do you have a question? Well, no, I was going to say if you have nothing further. Oh, okay. I just want to ask one preemption question. I hate to even do this, but there's, the district court, you never grapple with the district court's observation about remedies and laws. How do you deal with that? You mean the use of the word remedies instead of claims? Yeah. I see it as the use of the word remedies versus claims. That's, to me, that seems to be the parsing of words. My view is remedies come from claims. There's no such thing as a contract remedy in the ether. Contract remedies come from a contract claim. So when you get compensatory damages for breach of contract... You can interchange remedies and claims. I think remedies come from claims. I don't think you can have a contract remedy absent a contract claim. Well, once you have a successful claim of breach, then you talk about what... Then you talk about remedies. Is there compensatory damages? Are there injunctive relief? Is there attorney's fees? Is there fee shifting? All of these are remedies. And I just want to point out, you know, Ohio is with 32 other states that have this exact same displacement clause. And I just gave you just a smattering of some of the cases I was able to find. Everybody unanimously is finding this is clearly a categorical bar to breach of contract claims. This is literally the only case that stands alone in the sea of all these other cases cutting against the grain. So for those reasons and... Oh, the rest of my time. Thank you. Thank you, your honors. Good morning. May it please the court. My name is Andrew Peterson. I represent Applee, Christina Ramcook, and her associated entities. We've divided the Applee's argument. I have the first eight minutes. And on behalf of my clients, I'm going to talk about general issues. After me, Mr. Bruno has two minutes. I understand he may talk about the statute of limitations if he doesn't feel it's addressed in my argument. And then finally, Mr. Expeller has five minutes, and I understand he's going to talk about issues related to his client. At this point, Metron has two remaining claims, breach of contract and Ohio Uniform Trade Secrets Act. And both of those claims were properly dismissed at summary judgment. They both fail for the same essential reason, which is that Metron cannot prove, they do not have evidence, that the information they are claiming was misappropriated actually has value as a result of its being private as opposed to just general public information. It's very clear from Dr. Karapanos's- It clearly had value when you used it. I mean, how can you say it didn't have value? Well, your honor, the definition of trade secret and the Ohio Uniform Trade Secrets Act requires that information have value that is independent economic value derived as a result of not being generally known in the industry. Let me ask you a hypothetical. Apple's developing the iPhone 16, whatever the newest brand is. Version 99 they decide not to use. They go with version 100. You're saying version 99 doesn't have value? I'm saying that if Apple wants to prove in a lawsuit that version 99 has value, they have to actually show that it has value. Here, the issue is- You're saying anyone can steal, under your theory, anyone can steal the trade secrets of another and use them if that other isn't going to use them. No, that's not at all what I'm saying. What I'm saying is that Metron does not have any evidence that the 2014 patent application that it abandoned has value. The reason for that is that it's clear Dr. Carpano, Metron's president, was trying to create a new process that would create water-soluble- If your client didn't steal his patent or his trade secrets, they would have had to either develop it themselves, which would take time, or pay someone royalties to use someone else's process. That in and of itself shows it has value. Respectfully, your honor, I disagree because there's any number of products out there on the market that are clinoptilate suspensions, where you've got the mineral that's just in water. It's not dissolved. It's not water-soluble. When Dr. Carpano was trying to create a product, he wanted to create something that was different from that, that was different from any number of things that are out there on the market, and he failed. He created something that was not different from the other products that are out there on the market. As such, Metron, they don't have a way to show that there's anything about their process that's actually different from well-known, you know, any number of ways to make- Do you disagree that you used Metron's information? I think there's certainly a factual issue about whether it was used in the drafting of the Cook Endox. And you're saying, assume then, you, the light's in the most favorable to the plaintiff, plaintiff used it, or you used it. You're saying they lose because even if we used it, there's no value in that, even though we thought there was value, or we wouldn't have put it in. That is essentially what I'm saying, because under the Ohio Uniform Trade Secrets Act, you have to show not just that information is used, but that it actually qualifies as a trade secret under Ohio law. Any plaintiff can't just say, I have information, it was confidential, and the other side used it, therefore it's a trade secret. There's a definition of what a trade secret is, which includes that it had independent economic value. Doesn't the fact that you were able to use it, presumably profitably for your own purposes, doesn't that establish the value without regard to what the plaintiff in the case might have shown? I mean, it's kind of, and I think this is a variation on what Judge DePauw was asking, which is you've introduced arguably the factual information that would permit the finding of value, or I don't know if you introduced it, but the information about your actions. So Judge Gibbons, I think it's important to be clear that the value under the Ohio Uniform Trade Secrets Act has to derive from the information being confidential. And here, while as a matter of fact, the Cook-Entox patent application was filed in October of 2015, it's undisputed that the original 2014 Metron abandoned patent application became public in April of 2016, six months later. And all of the commercial activity that Metron is complaining about in this case, with the exception of just the filing of this patent application, occurred thereafter. You're getting the value of the time that you've got to jump on everyone to get patent pending, which has, I think their experts said, independent value as well. There's no evidence that that additional time gave value to the Applees or caused any harm to Metron. What they are complaining about is not that there's a competing product out on the market. There is evidence. They put in the evidence about patent pending. Well, right, Judge. What I'm saying is that Metron is complaining that the Applees had products which were marketed as patent pending. Patent pending is a label that can be ascribed as soon as a patent is filed. And the fact of the matter is that anyone, as of April 2016, could have looked at Metron's 2014 patent application and said, oh, I'm going to use this as a template. You're right, Judge. But the point is that Metron is not alleging commercial damage based on things that happened between October of 2015 and April of 2016. What they're alleging is that thereafter, there's all of these other products on the market. Yes, they are. They're saying by you being first in market, you're harming them directly because they lose sales. And that this was the zeolite solution or whatever, and they're losing as a result. And at least as far as I can see, there's no dispute that you've copied their work. Or there's a dispute. You're disputing it, but viewed in the light most favorable to the plaintiff. There is a factual issue on that point. What I'm... The core of what I'm trying to get at, Judge, while the 2014 application may have been used as a template for the Cook-NTOX application, the Cook-NTOX application is different. The USPTO has upheld it, and Metron argued, in fact, in front of the USPTO that the Cook-NTOX application should not have been granted because of the 2014 application. It was saying essentially that this is prior art, this is the same thing. The USPTO found, no, it's not the same thing. There's additional elements in the Cook-NTOX application that make it a different technology. And so what Metron is claiming here is that just because of the mere fact of how this patent application started out, anything that happens forever afterwards is injurious to them. You steal their information, yeah. That is what they're claiming. Maybe there's a, you know, maybe when you're dealing with causation, there's a time element. You know, that very well might be the case, but the fact is that the breaches happened at a certain time, and the fact that the damages happened later, I'm not sure that that matters. I mean, there was a timeline here. But their period of exclusivity was shortened because you jumped the gun. Well, again, there's, Metron is not claiming that there's a competing product out there that is actually doing what their products do. All they're claiming is that they have to face competition because there are other products out there that are marketed that way. And that occurred in mid-2016 and afterwards. So, thank you. I do have one question. Yes. You seem to be very involved in this field. Do patent applications often lift material from other related patents? To some extent, that does occur. Particularly, I mean, one example I'd point out is Metron has multiple patents. Their patents certainly have overlap with each other. Other patent applications often cite different patent applications. I understand that... You're talking about a different entity. Is it often that a different entity will take your patent application and include large portions of it? I don't have any data on the frequency with which that kind of thing is done. What I know is that my client has testified that she believed at the time she was drafting the 2015 patent application... She was drafting what? At the time she was drafting the Cook-Hentox patent application, she had an understanding that the 2014 prior application was public, but... Okay. Thank you. All right. Mr. Bruno, on behalf of Mr. Thomas. May it please the court. Paul Bruno on behalf of Clayton Thomas. In my two minutes, I really want to cut to the chase and address the issue on statute of limitations as it relates to Clayton Thomas. The appellant's argument is misplaced because the appellant is effectively relying on a theory that they have to be put on either actual or constructive notice. When they argue that, well, we wouldn't have known about it until 2017, that's the first time we could come forward. That's really misplaced when you look at what the law in this area is. The law in this area is cited as late as last week by this court. In effect, if somebody's put on notice that there is a misappropriation of trade secrets, then they have a duty at that point to use ordinary care and thoughtfulness in order to make further inquiry to see perhaps if the trade secret misappropriation is continuing in other areas. In this particular case, at least as early as February of 2016, that's when the complaint was filed, but it could have been before that, Mr. Karapanos was put on notice that perhaps Clayton Thomas was misappropriating the trade secrets. In their complaint, they filed, they made allegations that he had removed Metron's trade secrets, published or used the information, sought to knock off a patent, and relabeled and was selling Metron's product as vitality. Basically, it's the same trade secrets as what they're using in the case that's before the court. So the statute of limitations would have begun to run no later than February of 2016 as it pertains to Mr. Thomas. At that point in time, when the plaintiffs knew it looks like he's misappropriating our trade secrets, they could have done things like investigation, conducted discovery under that lawsuit, and done other things in order to inquire about is there further misappropriation. So the bottom line to it, under the current law, the statute of limitations required them to inquire further as opposed to just sit on it and wait on actual constructive notice. Because of that, the statute of limitations is a strong argument for Mr. Thomas in a case that should be affirmed at a minimum on that issue as well as the other issues. And that's fast. That's two minutes. Thank you. Good job for two minutes. All right. Well, thank you. Good morning, Your Honors. Chad Eggspieler of Tucker Ellis on behalf of Mark Adams, Top Partners Management and Intox Solutions. There's much to agree with what's been said and what's been said in our briefing as well as the district court's thorough decision. But we'd like to highlight three additional points as to why summary judgment was proper as to the Adams defendants and Intox. And one point I'm going to come back to, and I'd just like to respond to something that our brother on the other side of the aisle here mentioned. This is not just like a negligent statute. OUTSA specifically refers to knowing violations. And that's a point in our briefing that this is not a strict liability issue. This is not a race ipsa issue. And so just saying that a lot was copied and not framing their case in terms of what trade secret means under OUTSA is a fatal deficiency for their case. The first point we'd like to note is the abandoned claims. There's nothing in the opening brief of substance regarding Top Partners Management or Intox and those claims should all be deemed abandoned. So there's nothing about what? Two of our clients, so Intox Solutions and Top Partners Management are not mentioned in substance in the appellant's opening brief. And our point is that all of those positions are abandoned. And there's nothing in the reply brief addressing that abandonment issue either. We also view the judicial bias argument, the unfortunate argument, the end of the opening brief is also abandoned, not just because it's not mentioned in the reply brief, but because two of the contempt orders that have statements that they claim are objectionable not only are the statements justified but they didn't appeal those orders either. More substantive point on the trade secret claims as to our clients and just as a primer as this court's aware a trade secret claim in Ohio requires the existence of a trade secret improper acquisition and unauthorized use. And the last two elements acquisition and unauthorized use show where they have absolutely no evidence against our client Mr. Adams or Intox. Your Honor, Judge Lepar asked    what was the best evidence and I believe they also addressed this in their reply brief which is it all comes down to Ms. Cook's testimony at page ID 5732 where it was absolutely discussed as in she must have told Mark Adams that there was material from Metron and what would become the Cook Intox patent. If you actually look at the testimony she's asked a broad question did you tell any of your team and for Mark Adams, John Constantine, Trey Knight or anybody else of Intox     that you were writing based on documents you got from Metron. Her answer yeah their attorney,  she gives a specific answer and that's with whom it was absolutely discussed. If that alone was the situation it might be a close call but there's an immediate follow-up question okay, you said you disclosed it to the patent attorney did you say that to Mark Adams or to John Constantine, Trey Knight or anybody else? I don't remember what I said to them. I think they were in the room part of the time paraphrasing there. This is not a case where in the room where it happens carries the day. There is additional evidence that our client did not know and specifically gave instructions not to use information from anybody else and they acknowledge as much at pages 5 and 6 of their opening brief they acknowledge that our client Mr. Adams instructed Ms. Cook not to bring information from anybody else other sources that's not original to her. There's also her email a contemporaneous email from October 2015 that that was the goal. Her subsequent testimony I think at 5733 that everybody was on the same page but again this additional evidence shouldn't matter. It's not our burden. It was their burden to come forward with evidence creating a genuine issue of material fact. I hear what you say that there's no evidence or not enough evidence that he knew that she was using it but did he know that she showed up with all these documents? There's nothing in the record to indicate that he knew what documents she had or used and her testimony was that she alone drafted the Cook and Tocks patent. And again it was their burden to come forward with evidence. If they wanted to seek to overcome attorney-client privilege and depose Mr. Ross if they wanted to come forward with any additional evidence but to say that there was just a mess of facts on the day and there must have been some sort of nod and wink agreement he must have known that's not sufficient to overcome summary judgment. That's speculation. And that matters because under the statute misappropriation 1333.61 refers to improper means. And what does it define improper means of? These were all knowing instances of misconduct. Theft,  misrepresentation, breach of duty, espionage. That's 1333.61a. There's nothing factually in the record that indicates that our client Mr. Adams or that Intox had this sort of knowing acquisition. There's no evidence of use. We detail that in our brief. One final point and I have just a few seconds here addressing the what was the trade secret. They say that so much was copied. There was this magic formula in their opening brief. They never detailed what that formula was. In fact, in footnote 7 of our response we show all the instances of difference. This materiality aspect was their burden. They couldn't show it. And that's why this district court judgment should be affirmed. Thank you. Mr. Weister. Key part of the record when you were asking questions about isn't the fact that they used it to show that it has independent economic value. What counsel failed to point out to the court was a letter that Intox sent to Christina Cook. Because essentially Clayton Thomas and Christina Cook did to Intox what they did to Metron. After they created this patent they went off on their own without Mark Adams and took the Intox patent to make a product. They get a letter from Intox saying what you're doing is a breach of your confidentiality and you're misappropriating our trade secrets. In reference to their patent that they had just copied from Metron.  before this litigation their attorneys were taking the position you can't take the information in the Cook Intox patent and do what you want with it because that's our trade secret. Then when they come to court they say none of this stuff is trade secrets. Everyone knew everything. This concept that other products existed out in the market that's like saying Pepsi has no trade secrets because Dr. Pepper exists. I literally can't think of an industry where there's only one product and there's no other similar products. That does not mean that none of these companies have any trade secrets. Just to address one point made by Mr. Adams' attorney with respect to improper means he mentions misrepresentation and breach of duty. What he failed to point out in the record is that when this started when these products started to come out and they were saying we're patent pending they're saying we're the same product that Metron has. Metron going to its distributor at the time which was run by Mark Adams said are you involved with this with Thomas and Cook? Adams at that point says no. Thomas and Cook are common enemies. Metron and us share common enemies of Cook and Thomas. He did not say you know what actually I'm responsible for the genesis of all of this because I met behind your back and I took your patent application and I'm the one that unfurled this whole competition ball. I don't understand this argument right now that they're common enemies. You just told I mean they had a break. What does that show? I'm sorry. From the perspective of Metron it shows a complete lack of candor and misrepresentation by Mark Adams. Continuing to conceal the fact that he had met with them previously. At that point the point of that conversation weren't they a common enemy? That's how Mark Adams likes to say. He says well in my mind they were common enemies because they had absconded with the Cook Antox patent. But he clearly knew what Metron was asking. Can I ask a related question to Adams? Did he know that Thomas had provided Cook with the Metron documents? We believe there's sufficient genuine issues of fact on that. Where's the evidence we can point to? The fact that Cook testified she brought a pile of Metron documents. She testified that it was absolutely discussed that she was bringing Metron documents. She identifies the lawyer Did Adams testify to it? No, Adams I don't know what was going on in there. No one ever told me. In fact I made sure they promised that she wasn't using any. There's test and this is Mark Adams'  So I think a jury upon hearing all this conflicting evidence could very easily conclude that knowledge from Mark Adams' own lawyer that she was using Metron could be attributable to Mark Adams and was likely communicated directly to him by that lawyer. And I will point out they mention things about us deposing Mr. Ross Garrison. Mr. Ross Garrison was their sole IP expert. They pulled him as their expert witness. So we didn't have a chance to depose him. They canceled his deposition and then just moved for summary judgment without his testimony. Thank you. Did you try to depose Adams' lawyer? No. It wasn't necessary at that time. He was being an expert witness. We were going to depose him as an expert. They pulled him as an expert. In fact discovery closed. Thank you. Thank you. We appreciate the argument all of you have given and will consider the matter carefully. Thank you.